UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

KATHRYN TWA,

      Plaintiff,

                               Case No. 1:19-cv-1049

v.

                               Hon. Hala Y. Jarbou

MERCY HEALTH PARTNERS,

      Defendant.

_____/

## OPINION

Kathryn Twa was hired as a staff nurse at Mercy Health Partners, subject to a 90-day probationary period. About two months into her job, she discovered she was pregnant, a fact that she shared with a few supervisors. Twa was terminated at the end of her probationary period. She sued Mercy Health, alleging violations of Title VII, the Americans with Disabilities Act (ADA), and parallel Michigan statutes. (Compl., ECF No. 1.) Mercy Health now seeks summary judgment on all claims. (ECF No. 28.) The motion will be granted in part and denied in part.

### I. Jurisdiction

The Court has jurisdiction over Twa's Title VII and ADA claims because they arise under federal laws. 28 U.S.C. § 1331. The Court may exercise supplemental jurisdiction over Twa's state-law claims under the Elliott-Larsen Civil Rights Act (ELCRA) and Persons with Disabilities Civil Rights Act (PWDCRA) because they share a "common nucleus of operative fact" with the federal claims. *United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 725 (1966); 28 U.S.C. § 1367.

### II. Background

Twa began her job as a staff nurse at Mercy Health on May 14, 2018. (Twa Dep. 50, ECF No. 28-12.) Her employment was subject to a 90-day probationary period. (Employment Contract, ECF No. 28-6.) Supervisors would submit performance evaluations, and an employee

with unsatisfactory performance could be terminated at the end of the probationary period.  (Dease-Davis Dep. 10, ECF No. 28-13.)

Twa had two direct supervisors.  Marcie Klinge was her Preceptor, "a staff nurse that . . . is paired with the [new hire] to basically show the hands-on [work] . . . the actual surgery procedures."  (*Id.* at 11.)  Terri Grego was Twa's Nurse Educator.  (*Id.*)  Nurse Educators meet with the new hire and provide feedback during the probationary period.  (*Id.* at 10.)  Nurse Educators also submit performance evaluations to a clinical manager who decides whether the probationary employee is meeting expectations.  (*Id.* at 17.)  In this case, clinical manager Chandra Dease-Davis received an intensely negative evaluation of Twa from Grego and decided to fire her at the end of her probationary period on August 8, 2018.  (*Id.* at 25.)

Shortly after she began her job, Twa received a modestly positive performance evaluation.  (6/3/2018 Evaluation, ECF No. 28-8, PageID.248.)[1]  Two days before her termination, Twa received a much more critical evaluation.  (8/6/2018 Evaluation, ECF No.28-8, PageID.237-238.)  Between those two evaluations, Twa learned she was pregnant.  Twa contends the difference between the two evaluations is the result of pregnancy discrimination.  She says the latter evaluation was fabricated, a false pretext to justify her firing.

There are a few key disputes in this case: (1) whether or not Twa was doing a good job; (2) who knew that Twa was pregnant; and (3) when they learned she was pregnant.  Facts pertinent to each issue will be sketched below.

There are three evaluations in the record.  One is an "Initial Competency" form dated two days after Twa began her job.  (5/16/2018 Evaluation, ECF No. 28-8, PageID.239.)  It indicates

---

[1] The evaluation is dated May 3, 2018.  That cannot be right because Twa did not start working at Mercy until May 14.  The parties agree the evaluation in question was filled out shortly after Twa began her job, so the Court will assume that the evaluation was actually created on June 3.

Twa's ability to perform certain procedures.  The next is an evaluation by Grego a few weeks later. (6/3/2018 Evaluation, PageID.248.)  She and Dease-Davis met with Twa to discuss her progress and highlight some issues.  Twa had been late to work and nurse "huddles" several times.  (*Id.*) She also needed "to continue to learn . . . coordination and prioritiz[ation] of perioperative needs," which was expected to improve over time.  (*Id.*)  Twa had also talked or asked questions at inappropriate times during surgeries.  (*Id.*)  Twa seemed "very nervous," but she was assured that the meeting "was just a check up to see how she was doing."  (*Id.*)  The evaluation also noted that Twa was "[i]nquisitive and ha[d] good critical thinking skills."  (*Id.*)

Grego's evaluation that immediately preceded Twa's termination was much more negative. (8/6/2018 Evaluation, ECF No. 28-8, PageID.237-238.)  Grego said "[m]et with Marcie Klinge to discuss [Twa's] progress with concerning findings."  (*Id.*, PageID.237.)  Twa was "very slow in movement including walking, speech, opening supplies, etc."  (*Id.*)  Her "demeanor [was] not conducive to a perioperative environment."  (*Id.*)  Klinge "discussed how [Twa] does not sequence the correct supply needs for a procedure, or read and anticipate position needs correctly[.]"  (*Id.*) "When given constructive criticism, [Twa] becomes defensive or does not listen with frequent interruptions[.]"  (*Id.*)  She "continue[d] to struggle with being punctual and keeping commitments."  (*Id.*)  Twa missed several "scheduled shadow experiences" without satisfactory explanation. (*Id.*)  She was "constantly on the phone" and frequently requested additional breaks. (*Id.*)

Grego did note "improved . . . socialization with physicians."  (*Id.*)  But that was the only positive thing.  She assessed Twa as having "[a]verage critical thinking skills"—not necessarily bad, but worse compared to the prior evaluation.  (*Id.*, PageID.238.)  Summarizing, Grego felt that Twa had "difficulty following directions and lack[ed] follow through" and she questioned Twa's

"sense of integrity."  (*Id.*, PageID.237.)  Grego indicated she would "[f]ollow up with [Dease-Davis] . . . to determine options upon consulting with HR."  (*Id.*, PageID.238.)  Concluding, Grego said Twa did "not fit into the **culture and values** of Mercy Health" and never would; Grego was "very concerned about [Twa's] sense of integrity and fit with the organization" and believed "further issues will arise after [Twa] is off orientation."  (*Id.* (emphasis in original).)  Dease-Davis fired Twa two days later.  (*Id.*)  According to Twa, Dease-Davis said she was being terminated for moving too slowly, for not being a good fit, and for poor progression.  (Twa Dep. 129, ECF No. 28-12.)

Twa was blindsided.  (*Id.* at 131-32; Twa-Klinge Texts, ECF No. 29-8, PageID.709.) Just after being fired, she texted Klinge "I wish I would've known that I wasn't doing very well" and that she was "very confused and . . . trying to understand" what led to her termination.  (Twa-Klinge Texts, PageID.709.)  Others seemed surprised too.  Replying to Twa, Klinge said she had "no indication" that she was about to be fired.  (*Id.*)  Gay Hudson, who occasionally filled in as a Preceptor for Twa when Klinge was unavailable, also expressed surprise.  (ECF No. 29-7, PageID.702.)  Hudson said she spoke to Dease-Davis and told her that she thought Twa was "doing fine."  (*Id.*)  A surgeon at Mercy Health, Christopher Eyke, felt Twa did a good job when they worked together and also spoke to Dease-Davis on Twa's behalf.  (Eyke Aff., ECF No. 29-6.)  In her own deposition, Twa said she consistently received positive feedback and that no one raised any serious issues with her performance.  (Twa Dep. 75, 128, 130.)  She believes that Klinge fabricated all the negative things mentioned in the August 6 evaluation.  (*Id.* at 117.)

Between the June evaluation and the August evaluation/termination, Twa became pregnant.  She first learned of her pregnancy on July 5.  (*Id.* at 99.)  Twa says she told Klinge and Dease-Davis about the pregnancy, partly because she wanted to avoid surgical procedures that

involved "dangerous chemicals." (*Id.* at 100, 106, 110.)  Twa states that Dease-Davis promised to inform staff of this request.  (*Id.* at 106.)  Dease-Davis says she does not recall Twa mentioning her pregnancy until the termination meeting, though such information would not be memorable because "[t]he [operating room] is full of females, so it's quite a common thing for nurses to be pregnant;" it was even common to "have a number of pregnant colleagues at one time."  (Dease-Davis Dep. 26, 39.)  Twa never told Grego about the pregnancy.  (Twa Dep. 134-35.)

Unfortunately, Twa's pregnancy came with some complications and her health suffered as a result.  One day at work, Twa was "feeling very sick and dizzy [and] lightheaded." (*Id.* at 108.) Someone took her blood pressure, which was "very low." (*Id.*)  Twa called her doctor, who advised her to go home, which she did.  (*Id.*)  This happened a week or two before she was terminated.  (*Id.* at 109.)  Twa says she also experienced low blood pressure, lethargy, extreme nausea, and vomited during breaks.  (*Id.* at 129-32.)  She did not request any accommodations other than the time off.  After being fired, Twa was diagnosed with Gestational Diabetes Mellitus, a type of diabetes tied to pregnancy.  (*Id.* at 164.)

### III. Standard

Summary judgment is appropriate when the moving party demonstrates that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  Courts must examine the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," to determine whether there is a genuine dispute of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (quoting Fed. R. Civ. P 56(c)) (internal quotations omitted).

A fact is material if it "might affect the outcome of the suit." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A material fact is genuinely disputed when there is "sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Id.* at 249

(citing *First Nat'l Bank. of Ariz. v. City Serv. Co.*, 391 U.S. 253, 288-89 (1961)).  "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party [by a preponderance of the evidence], there is no 'genuine issue for trial.'"  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting *City Serv.*, 391 U.S. at 289).

In considering the facts, the Court must draw all inferences in the light most favorable to the nonmoving party.  *Id.*  Summary judgment is not an opportunity for the Court to resolve factual disputes.  *Anderson*, 477 U.S. at 249.

## IV. Analysis

### A. Claims Twa Fails to Defend

The Court begins with a host of claims that Twa has failed to defend.  Under Title VII, the ELCRA, the ADA, and the PWDCRA collectively, Twa claimed she was harassed, subject to sex discrimination, subject to a hostile work environment, refused reasonable accommodations, and terminated for discriminatory reasons.  (*See generally* Compl.)  Mercy Health seeks summary judgment on all claims.  In opposing summary judgment, Twa limits her defense to the claims of discriminatory termination.  "When a plaintiff 'fails to address [a claim] in response to a motion for summary judgment,' the claim is deemed waived."  *Alexander v. Carter for Byrd*, 733 F. App'x 256, 261 (6th Cir. 2018) (quoting *Haddad v. Sec'y, U.S. Dep't of Homeland Sec.*, 610 F. App'x 567, 568-69 (6th Cir. 2015)) (alteration in original).  The Court therefore grants Mercy Health's motion for summary judgment on all claims Twa failed to defend.  The sole remaining claims are that Mercy Health committed pregnancy and/or disability discrimination when it terminated Twa.

### B. Claims of Pregnancy Discrimination

Adverse actions on the basis of pregnancy are treated as a prohibited form of sex discrimination under Title VII.  *Tysinger v. Police Dep't of City of Zanesville*, 463 F.3d 569, 572 (6th Cir. 2006) (citing 42 U.S.C. § 2000e(k)).  The same is true under the ELCRA.  Mich. Comp.

Laws § 37.2202(1)(d).  "[F]ederal and state pregnancy discrimination claims are evaluated generally under the same substantive standards." *Tysinger*, 463 F.3d at 572 (citing *Kocak v. Cmty. Health Partners of Ohio, Inc.*, 400 F.3d 466, 471-72 (6th Cir. 2005)).  The Court does not discern any substantive differences between Title VII and the ELCRA here, nor do the parties point to any.

Twa's Title VII and ELCRA claims are not premised on direct evidence of pregnancy-based discriminatory animus.  Nor need they be.  She may build her claims on indirect evidence of discrimination.  *Id.* at 572-73.  Claims of pregnancy discrimination based on indirect evidence are subject to the *McDonnell Douglas* burden-shifting framework.  *Id.* (citing *McDonnell Douglas v. Green*, 411 U.S. 792, 802-03 (1973)).  Under *McDonnell Douglas*, the plaintiff must first present evidence establishing a *prima facie* case of discrimination.  If she can do so, the defendant-employer must "articulate some legitimate, nondiscriminatory reason" for its action.  *McDonnell Douglas*, 411 U.S. at 802.  If the employer-defendant can do so, the burden shifts back to the plaintiff, who must produce evidence showing that the reason given by the defendant-employer was merely pretextual.  *Id.* at 804-05.

As will be explained below, Twa has made a *prima facie* case of pregnancy discrimination. Mercy Health has articulated a nondiscriminatory purpose.  And Twa has produced evidence that, if believed, would demonstrate Mercy Health's proffered reason for termination was merely pretextual.  The motion for summary judgment on the Title VII and ELCRA pregnancy discrimination claims will therefore be denied.

### 1. Twa has established a *prima facie* case of pregnancy discrimination

A *prima facie* case of pregnancy discrimination has four elements.  Twa must present evidence showing that "(1) she was pregnant, (2) she was qualified for her job, (3) she was subjected to an adverse employment decision, and (4) there is a nexus between her pregnancy and the adverse employment decision." *Tysinger*, 463 F.3d at 573 (quoting *Prebilich-Holland v.*

*Gaylord Ent. Co.*, 297 F.3d 438, 442 (6th Cir. 2002)) (internal citation and quotations marks omitted).  Mercy Health contends that Twa has failed to establish the second and fourth elements.

Mercy Health argues that Twa was not qualified because she failed to meet "'the employer's legitimate expectations and was performing to the employer's satisfaction.'"  (Def.'s Mot. for Summ. J. 14 (quoting *Dews v. A.B. Dick Co.*, 231 F.3d 1016, 1022 (6th Cir. 2000)).) However, this rule was abandoned by the Sixth Circuit in 2003: "At the prima facie stage, a court should focus on a plaintiff's *objective* qualifications to determine whether he or she was qualified for the relevant job" rather than ask whether the plaintiff was doing a good job.  *Wexler v. White's Fine Furniture, Inc.*, 317 F.3d 575 (6th Cir. 2003) (en banc) (emphasis in original).  Asking whether the employee was doing a satisfactory job impermissibly jumps the gun—such questions are reserved for the second step of the *McDonnell Douglas* framework where the employer must articulate a legitimate nondiscriminatory reason for the adverse action.[2]  *Id.* at 574.

Objective qualifications include "'the plaintiff's education, experience in the relevant industry, and demonstrated possession of the required general skills.'"  *George v. Youngstown State Univ.*, 966 F.3d 446, 464-65 (6th Cir. 2018) (quoting *Wexler*, 317 F.3d at 576).  Mercy Health does not claim that Twa lacked such qualifications.  The record shows she possessed relevant education and work experience.  Twa has shown that she was qualified for her job at Mercy Health.

Mercy Health also argues that Twa has failed to establish a nexus between her pregnancy and termination.  "Temporal proximity . . . can satisfy the nexus requirement in the pregnancy

---

[2] It appears that Michigan courts still employ the legitimate expectations test for ELCRA claims.  *See Town v. Mich. Tel. Co.*, 568 N.W.2d 64, 69 (Mich. 1997) ("An employee is qualified if he was performing his job at a level that met the employer's legitimate expectations.").  However, the Michigan Supreme Court in *Town* stated that "[t]he purpose of a prima facie case is to force the defendant to provide a nondiscriminatory explanation for the adverse employment action," and that where the defendant has done so, courts can "elect to presume that [the] plaintiff has established a prima facie case."  *Id.*  Because Mercy Health has provided a legitimate nondiscriminatory reason for firing Twa, the Court will presume that she established a *prima facie* case with respect to her ELCRA claim.

discrimination context." *Asmo v. Keane, Inc.*, 471 F.3d 588, 593 (6th Cir. 2006) (citing *Prebilich-Holland*, 297 F.3d at 444). However, a plaintiff must also show that the defendant knew "that the plaintiff was pregnant or had the capacity to become pregnant." *Figgins v. Advance Am. Cash Advance Ctrs. of Mich., Inc.*, 476 F. Supp. 2d 675, 690 (E.D. Mich. 2007) (citing *Prebilich-Holland*, 297 F.3d at 444).

Mercy Health points out that there is no evidence that Grego knew of Twa's pregnancy. However, from Twa's brief, it is clear that she views Dease-Davis as the source of the adverse action. (Pl.'s Opp'n Br. 15, ECF No. 29 ("Dease-Davis . . . was responsible for [Twa's] termination.").) Thus the relevant question is whether Dease-Davis knew of Twa's pregnancy. Twa says she told Dease-Davis about the pregnancy because she wanted to avoid harmful chemicals used in certain operations, a request that Dease-Davis granted according to Twa. At her deposition, Dease-Davis said Twa did not mention being pregnant until the termination meeting, but also that she would not likely remember an earlier conversation about pregnancy since it was a common occurrence among Mercy Health nurses. If Twa's account is believed, she has shown that Dease-Davis knew she was pregnant.

And Twa has shown sufficient temporal proximity to establish a nexus. Although the dates are not perfectly clear, she says that she told Dease-Davis about her pregnancy around late July 2018. (Twa Dep. 105.) Dease-Davis fired Twa approximately a week later, on August 8. Dease-Davis's knowledge of the pregnancy and her termination of Twa occurred close enough in time to satisfy the fourth element of a *prima facie* case. *See Asmo*, 471 F.3d at 594 (sufficient temporal proximity where plaintiff terminated two months after defendant learned of pregnancy). In sum, Twa has made out a *prima facie* case of pregnancy discrimination, satisfying the first step of the *McDonnell Douglas* analysis.

### 2. Mercy Health has articulated a legitimate, nondiscriminatory reason

Though the parties more or less skip over this step, the Court finds that Mercy Health has articulated a legitimate, nondiscriminatory reason for firing Twa.  Her employment was subject to a 90-day probationary period.  At the end of that period, Grego, in collaboration with Klinge, produced an intensely negative review of Twa's performance.  Acting on that review, Dease-Davis terminated Twa at the end of her probationary period.  The entire point of a probationary period is to have a trial run with a new employee.  A negative review is a legitimate, nondiscriminatory reason behind firing Twa.

### 3. Twa has produced evidence demonstrating pretext

Where the defendant has articulated a legitimate, nondiscriminatory reason for termination, the plaintiff can save her claim by presenting evidence that the proffered reason is merely a pretext for discriminatory conduct.  The plaintiff "can demonstrate pretext by showing that the proffered reason (1) has no basis in fact, (2) did not actually motivate the defendant's challenged conduct, or (3) was insufficient to warrant the challenged conduct."  *Michael v. Caterpillar Fin. Servs. Corp.*, 496 F.3d 584, 597 (6th Cir. 2007) (internal quotation marks omitted).  "Proof that the defendant's explanation is unworthy of credence is simply one form of circumstantial evidence that is probative of intentional discrimination, and it may be quite persuasive."  *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 147 (2000).  "[I]t is permissible for the trier of fact to infer the ultimate fact of discrimination from the falsity of the employer's explanation."  *Id.* (emphasis deleted).

Twa has presented evidence that, if believed, would demonstrate that the proffered reason for her termination—poor performance—has no basis in fact.  Twa said that the negative August report, which she says she saw for the first time at her deposition in this case, was fabricated.  (Twa Dep. 117 (Q: "So are you saying that [Klinge] has made all of this up[?] A: "It sounds like it to

10

me, sir.").)  Twa said she consistently received positive feedback and that no one raised any serious issues with her performance.  Viewing her texts with Hudson and Klinge in a light most favorable to Twa, her immediate supervisors were also surprised to learn of her termination and had no indication it was coming.  Dr. Eyke felt Twa was doing a good job as well.  Finally, Twa claims that Dease-Davis told her to reapply for the job in a year, presumably after she was done being pregnant.  (*Id.* at 178-79.)  If Dease-Davis truly told Twa to reapply in a year, a reasonable jury could infer that the negative report was false: the August report is so negative that one would not expect Dease-Davis to ever invite Twa to reapply.

Of course, Mercy Health has its own plausible account of events.  But all that does is create a genuine dispute of material fact.  Based on the evidence Twa presents, a reasonable jury could determine that the August report was a fabricated post-hoc justification for terminating Twa, and that the real reason she was fired was for being pregnant.  Because the parties have met their respective burdens under the *McDonnell Douglas* framework, summary judgment will be denied with respect to Twa's pregnancy discrimination claims.

### C. Claims of Disability Discrimination

Both the ADA and PWDCRA prohibit firing an employee because of a disability.  *Donald v. Sybra, Inc.*, 667 F.3d 757, 763 (6th Cir. 2012); *Chiles v. Mach. Shop, Inc.*, 606 N.W.2d 398, 405-06 (Mich. Ct. App. 1999) (citing Mich. Comp. Laws § 37.1103(d)(i)).  "The PWDCRA substantially mirrors the ADA, and resolution of a plaintiff's ADA claim will generally, though not always, resolve plaintiff's PWDCRA claim."  *Donald*, 667 F.3d at 764 (internal quotation marks omitted).  The parties here do not point to any pertinent differences between the ADA and PWDCRA in this case, nor does the Court identify any such differences.

Though pregnancy itself is not considered a disability, pregnancy-related conditions can qualify.  *Spees v. James Marine, Inc.*, 617 F.3d 380, 396 (6th Cir. 2010) (citing *Navarro v. Pfizer*

11

*Corp.*, 261 F.3d 90, 97 (1st Cir. 2001) ("While pregnancy itself may not be an impairment, the decided ADA cases tend to classify complications resulting from pregnancy as impairments.")). Thus, under the definitions relevant here, a pregnancy complication can count as a disability if it causes "a physical or mental impairment that substantially limits one or more major life activities" or causes the plaintiff to be "regarded as having such an impairment."  42 U.S.C. § 12102(1); *see also* Mich. Comp. Laws § 37.1103(d) (similar language for the PWDCRA).

As with sex discrimination claims, claims of disability discrimination can succeed on indirect evidence alone.  Such claims are also subject to the *McDonnell Douglas* burden-shifting analysis.  *Ferrari v. Ford Motor Co.*, 826 F.3d 885, 891 (6th Cir. 2016), *abrogated on other grounds*, 942 F.3d 308, 319 (6th Cir. 2019).  Here, Mercy Health limits its argument to the first step, asserting that Twa has failed to establish a *prima facie* case of disability discrimination.

To establish a *prima facie* case, a plaintiff must show that: (1) she is disabled, (2) she is otherwise qualified for the position, with or without reasonable accommodation, (3) she suffered an adverse employment decision, (4) the employer knew or had reason to know of the plaintiff's disability, and (5) the position remained open while the employer sought other applicants or the disabled individual was replaced.  *Ferrari*, 826 F.3d at 891-92.

Mercy Health offers a different and incorrect test.  It says Twa must establish that "(1) she is an individual with a disability, (2) that she is otherwise qualified to perform the job requirements, with or without reasonable accommodation, and (3) that Mercy Health discharged her solely because of the disability." (Def.'s Mot. for Summ. J. 22-23 (citing *Cotter v. Ajilon Servs., Inc.*, 287 F.3d 593, 598 (6th Cir. 2002) (citing *Monette v. Elec. Data Sys. Corp.*, 90 F.3d 1173, 1178 (6th Cir. 1996))).)  This three-element test "is not used in the context of establishing a *prima facie* case for purposes of *McDonnell Douglas*, but is rather in the context of what is required for *recovery*

12

under the ADA." *Whitfield v. Tennessee*, 639 F.3d 253, 259 (6th Cir. 2011) (citing *Monette*, 90 F.3d at 1179) (emphasis in original).  The three-element test is inapplicable to the *prima facie* inquiry because "its third element—whether the employee was, in fact, discharged because of the disability—requires at the *prima facie* stage what the *McDonnell Douglas* burden-shifting framework seeks to uncover only through two additional burden shifts, thereby rendering that framework wholly unnecessary."  *Id.*

Put another way, a defendant is only liable for disability discrimination where it took an adverse action against a disabled person because of that person's disability—that is the three-element test.  But the question is how a plaintiff goes about *proving* their claim.  When only indirect evidence is involved, they do so through the *McDonnell Douglas* framework: establish a *prima facie* case and demonstrate that the defendant's proffered legitimate reason for the adverse action was merely pretextual.  The five-element test determines whether the plaintiff has made a *prima facie* case.

Mercy Health uses the inappropriate three-element test to argue that Twa lacks a *claim*, not that she is unable to *recover*.  (*See* Def.'s Mot. for Summ. J. 23 ("Plaintiff cannot establish a *claim* for disability discrimination[.]") (emphasis added).)  Even if Mercy Health were arguing that Twa could not recover for an incident of disability discrimination, the proffered test is still incorrect.  The Sixth Circuit has explicitly rejected the old requirement that a plaintiff be discharged "solely" because of her disability.  *Lewis v. Humboldt Acquisition Corp., Inc.*, 681 F.3d 312, 317 (6th Cir. 2012) (ADA imposes liability where employer takes adverse action "because of" disability, not "solely" due to discrimination).

The best the Court can do is to examine the two prongs that the five-element test and three-element test share: (1) whether Twa was disabled, and (2) whether she was qualified for her job,

with or without accommodations.  Unlike the sex discrimination claims, however, Mercy Health does not argue that Twa's disability claims fail because she was unqualified.[3]  Therefore, the Court will limit its analysis to the first element.  There is a genuine dispute of material fact on whether Twa was disabled, rendering summary judgment inappropriate.

About four months after her termination, Twa was diagnosed with gestational diabetes mellitus (GDM), a form of diabetes that can occur during pregnancy.  (Twa Dep. 132, 152.)  Mercy Health argues that, because Twa was not diagnosed until after she was fired, she "cannot show that she was disabled, by virtue of [GDM]" during her employment.  (Def.'s Mot. for Summ. J. 23.)  But that is not exactly true.  Twa attributes her lethargy and sickness at Mercy Health to her undiagnosed GDM.[4]

Twa does not need a contemporaneous diagnosis so long as she can link her diagnosed condition to her pre-diagnosis symptoms and show that those symptoms substantially limited one or more life activities.  *Cf. Cartwright v. Lockheed Martin Util. Servs., Inc.*, 40 F. App'x 147, 154 (6th Cir. 2002) (diagnoses of hypertension, depression, sleep apnea, and neck pain did not render plaintiff disabled where symptoms of alleged disability were caused by plaintiff's poor relationship with his supervisors); *Neely v. Benchmark Fam. Servs.*, 640 F. App'x 429, 435 (6th Cir. 2012) ("[Plaintiff's] self-described symptoms . . . without corroborating medical evidence or any diagnosis are insufficient to establish a substantial limitation on a major life activity.")  Mercy

---

[3] Even if Mercy Health had made a qualification-based argument, that argument would fail for the same reason it failed against Twa's sex discrimination claims.

[4] Twa appears to maintain two contradictory positions at the same time.  With respect to her sex discrimination claims, Twa contends that the August 6 report, which among other things criticized her as slow and inattentive, is entirely false.  With respect to her disability discrimination claims, however, Twa says that her GDM and/or low blood pressure caused her to feel sick and move more slowly.  Either Twa was doing a good job, rendering the August 6 report pretext to fire her for being pregnant, or she was doing a bad job because of pregnancy complications, in which case Mercy Health's complaints about Twa's performance were grounded in fact but potentially discriminatory on disability grounds.  The Court does not see how both can be true at the same time.  However, it is the jury's job to make a credibility determination and decide which version of events, if any, is true.

Health makes no argument that Twa's symptoms were not caused by GDM, or that they did not substantially limit life activities; it merely argues that Twa could not have been disabled because she was not diagnosed with GDM at the time of her termination.  That argument fails.

Twa also says that she experienced low blood pressure during her first trimester.  Mercy Health points out that there are no medical records in evidence from Twa's first trimester addressing her blood pressure.  (*See* Twa Dep. 174.)  She had an examination in her second trimester, which indicated normal blood pressure and no "known diagnosis of chronic hypertension."  (*Id.* at 149-150.)  The only evidence in the record corroborating Twa's claim is that the day she went home from work because she felt so ill, someone at Mercy Health—Twa does not remember exactly who—took her blood pressure and it was "very low."  (*Id.* at 108.) Twa has not provided sufficient corroborating medical evidence to show that she suffered from low blood pressure during her first trimester.  *Neely*, 640 F. App'x at 435.  Therefore, her claims of disability discrimination cannot rest on her purported low blood pressure.

## V. Conclusion

For the foregoing reasons, Mercy Health's motion for summary judgment will be granted in part and denied in part.  The Court will enter summary judgment on all claims that Twa failed to defend.  Her claims that she was terminated because of her pregnancy or because of her GDM survive.  An order will enter consistent with this opinion.

Dated:   August 20, 2021                    /s/ Hala Y. Jarbou
                                            HALA Y. JARBOU
                                            UNITED STATES DISTRICT JUDGE